UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 18-10117-RGS

C. WILLIAM HOILMAN

v.

MELVIN JACOB WERNER

MEMORANDUM AND ORDER ON PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

June 21, 2019

STEARNS, D.J.

C. William Hoilman brought this lawsuit against Melvin Jacob Werner, among others,[1] for participating in a fraudulent scheme to induce him to invest in diamonds and marble.[2] More specifically, the Complaint sets out ten claims: breach of contract (Counts I and II), breach of the implied covenant of good faith and fair dealing (Counts III and IV), unjust enrichment (Counts V and VI), violation of Mass. Gen. Laws ch. 93A, §§ 2, 11

---

[1] The court has entered default judgments against the remaining defendants – Werner Management LLC, J. Chandler Peterson, IC Resources Investments-I LLC, Geoffrey McRae, Joe Nathan Ward, and Basketball Ministries International, Inc. (BMI) – for failure to plead or otherwise defend. *See* Dkt ## 54, 63, 74, 90, 104.

[2] Hoilman is a resident of Massachusetts, while Werner is a resident of Tennessee. *See* Compl. (Dkt # 1) ¶¶ 1-2; Answer (Dkt # 41) ¶ 2.

(Counts VII and VIII), and fraud (Counts IX and X). Hoilman moves for partial summary judgment on Counts II, IV, VIII, and X.[3] For the reasons to be explained, Hoilman's motion for partial summary judgment will be denied.

## BACKGROUND

The facts, viewed in the light most favorable to Werner as the nonmoving party, are as follows. In 2014, defendant Ward asked for Werner's assistance in securing funding for a marble mine in Friendsville, Tennessee that defendant BMI purportedly owned. After touring the mine, Werner was appointed a Director of BMI on July 17, 2015. In early 2015, Oman Kruj, who presented himself as a consultant for a Saudi Arabian investment firm named Al-Muhaidib Group, contacted Werner about a $105 million investment in the mine. Ward then set up a BMI account in Spain, and Werner met with Kruj, among others, in Madrid in August of 2015 to confirm that the promised $105 million had indeed been deposited. Werner learned, however, that because of an unexpected tax, BMI needed more money to access the account.

---

[3] Since these Counts only concern Hoilman's marble mining investment, the court does not discuss his diamond mine investment.

On September 27, 2015, defendants Peterson and McRae called Hoilman to request that he invest $60,000 in the marble mine. On October 6, 2015, Peterson forwarded Hoilman an email, which stated that although BMI had "already secured and been transferred full funding for its Tennessee high quality Marble Mine Project" valued at over $2 billion, BMI was "in immediate need of a fully secured hard money loan." Hoilman Aff. (Dkt # 110), Ex. 1. The email specifically requested a $60,000 loan to address "an unexpected transfer tax . . . imposed by the Spanish government" after Werner, acting as BMI's attorney, had "personally opened the account" in Madrid. The loan would be secured by "the proceeds of 3 blocks, or as negotiated, of the existing cut marble." The email further described two "exit plans" for the loan repayment, entitling Hoilman to either $120,000 or $300,000 dependent on certain contingencies. Hoilman was also provided with a "European Tax Certificate," which represented that the "European Economic Commission Board" had "sanctioned, certified, [a]uthenticated, and approved the transfer of" $105 million. *Id.*, Ex. 2.

That same day, Hoilman was forwarded an email from Werner, detailing the "Deal Points for [the] Hard Money Loan and Promissory Note." *Id.*, Ex. 3. The email included a promissory note acknowledging that Hoilman would be repaid $105,000 by October 28, 2015, but if not, that "the

Parties [would] execute and file a UCC-1 document perfecting [Hoilman's] security interest" of $262,500.[4]

The following day, Hoilman unsuccessfully attempted twice to wire $52,500 to BMI. He was then instructed to wire $60,000 directly to Werner at a bank account for Werner Management, where Werner was, at the time, the Director. On October 26, 2015, Hoilman successfully completed the $60,000 wire transfer.

Over the next several months, Hoilman repeatedly requested that his loan be repaid, and Werner consistently responded that repayment was in the works. For instance, on November 23, 2015, Werner represented in an email that he "had to wire additional funds to attorney [sic] for notarization and legalization of documents for the tax release," but that "all should be settled no later then [sic] Wednesday this week." Compl., Ex. R. Similarly, in a February 9, 2016 email, Werner stated that "[g]etting our funds released from the bank in Spain became very problematic," but that he "anticipate[d] that they [would] have everything completed within the next 10 days." Hoilman Aff., Ex. 10. However, on April 26, 2017, Werner sent Hoilman an email acknowledging for the first time, among other things, that he "ha[d]

---

[4] The amounts cited in the promissory note were based on a loan of $52,500, but Hoilman ultimately invested $60,000.

4

been working, going on a year now, on recovering the funds invested in the Spanish transaction, which turned out to be fraudulent." *Id.*, Ex. 13. To date, Hoilman has not been repaid his $60,000 investment.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it has the potential of determining the outcome of the litigation." *Maymí v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008). "An issue is 'genuine' when a rational factfinder could resolve it [in] either direction." *Boudreau v. Lussier*, 901 F.3d 65, 71 (1st Cir. 2018) (citation omitted). Thus, "[t]o succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).

### *Breach of Contract*

"Under Massachusetts law, a breach of contract claim requires the plaintiff to show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result."

5

*Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013), citing *Singarella v. City of Bos.*, 342 Mass. 385, 387 (1961).

Here, Hoilman alleges that Werner breached their contract by failing to adhere to the terms of the loan set out in the promissory note. Specifically, Hoilman transferred $60,000 to Werner Management in exchange for an investment in a marble mine purportedly owned by BMI, but he has neither been repaid nor provided the promised security interest in $300,000 worth of marble blocks. There is, however, an intractable problem with the effort to hold Werner personally to the contract. Since Werner signed the promissory note *on behalf of BMI*, *see* Hoilman Aff., Ex. 3, he cannot be held liable for the breach because, as a matter of law, he is not a party to the contract, *see Marshall v. Stratus Pharm., Inc.*, 51 Mass. App. Ct. 667, 673 (2001) ("Unless otherwise agreed, a person making or purporting to make a contract for a disclosed principal does not become a party to the contract."),

quoting *Porshin v. Snider*, 349 Mass. 653, 655 (1965).[5] The court, therefore, dismisses the breach of contract claim (Count II).[6]

***Fraud***

"To establish a claim for fraud under Massachusetts law, a plaintiff must prove that 'the defendant made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage.'" *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 31 (1st Cir. 2009), quoting *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 458 (2002).

Here, Hoilman alleges that Werner made numerous representations that he knew, or should have known, to be false, which Hoilman reasonably relied upon in parting with his $60,000 investment. For example, Werner's October 6, 2015 email, along with the attached promissory note, detailed the

---

[5] Werner also argues that Hoilman is not entitled to a piercing of the corporate veil. *See Spaneas v. Travelers Indem. Co.*, 423 Mass. 352, 354 (1996) ("Only in rare instances, in order to prevent gross inequity, will a Massachusetts court look beyond the corporate form."). Hoilman, in any event, does not rely on the doctrine.

[6] Having dismissed the breach of contract claim, the court necessarily must dismiss the breach of the implied covenant claim (Count IV) as well. *See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 230 (1st Cir. 2005) ("Having concluded that no contract exists, there can be no derivative implied covenant of good faith and fair dealing . . . .").

terms of Hoilman's investment, including that the "[p]urpose of the [l]oan [was] to pay a transfer tax imposed by the Spanish regulatory authorities;" that he would be repaid double his investment within three weeks or, if not, that he would receive five times his investment in the form of marble blocks; that Werner was authorized "to act in any and all manner necessary to effectuate transactions up to" $5 million; and finally, that "[t]ime [was] of the essence in this transaction." Hoilman Aff., Ex. 3. An earlier email represented to Hoilman that BMI had "already secured and been transferred full funding for its Tennessee high quality Marble Mine Project" and that Werner "personally opened the account" in Spain. Hoilman Aff., Ex. 1. Werner, however, conceded in his deposition that he had never confirmed, beyond clicking a link online, that the purported $105 million transfer to the account in the Madrid bank had actually occurred. He also admitted that he never visited the bank, and had only met with the purported Spanish banker at a hotel.

Werner, for his part, contends that he was not aware of the fraud and was, at all times, relying on information that he believed to be accurate. None of the denials much matter, however, because the issue of whether Werner knew that his statements were false is squarely a question of fact for the jury. *See Sudbury v. Scott*, 439 Mass. 288, 302 (2003) ("A person's intent is a

question of fact 'to be determined from his declarations, conduct and motive, and all the attending circumstances.'") (citations omitted); *Metro. Life Ins. Co. v. Ditmore*, 729 F.2d 1, 5 (1st Cir. 1984) ("State of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind."), quoting *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir. 1975); *Smith v. Jenkins*, 718 F. Supp. 2d 155, 166 (D. Mass. 2010) ("The issue of whether defendants made the statements with knowledge of their falsity and with the intent of inducing plaintiffs to act to their detriment is one of fact."). Similarly, whether Hoilman reasonably relied on the alleged misrepresentations is also a question of fact. *See Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 59 (2004) ("Reliance normally is a question for a jury."). Summary judgment on Hoilman's fraud claim (Count X) is, therefore, inappropriate.

### *Mass. Gen. Laws Chapter 93A*

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a).[7] Whether "conduct violates [Chapter] 93A is a legal, not a factual,

---

[7] Werner does not dispute that Section 11 of Chapter 93A is satisfied. *See Szalla v. Locke*, 421 Mass. 448, 451 (1995) (concluding that Section 11 "requires that there be a commercial transaction between a person engaged in trade or commerce [and] another person engaged in trade or commerce").

9

determination." *R.W. Granger & Sons, Inc. v. J & S Insulation, Inc.*, 435 Mass. 66, 73 (2001). "Conduct is unfair or deceptive if it is 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness' or 'immoral, unethical, oppressive, or unscrupulous.'" *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 25 (1st Cir. 2001), quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975).

Here, Hoilman alleges that Werner violated Chapter 93A by, as described above, participating in a fraudulent scheme that induced Hoilman to part with his $60,000. *See McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 714 (1990) ("Common law fraud can be the basis for a claim of unfair or deceptive practices under the statute."). Hoilman contends that Werner is not shielded from liability as an officer of Werner Management and BMI (entities that the court has already defaulted). *See Townsends, Inc. v. Beaupre*, 47 Mass. App. Ct. 747, 751 (1999) ("A corporate officer is personally liable for a tort committed by the corporation that employs him, if he personally participated in the tort by, for example, directing, controlling, approving, or ratifying the act that injured the aggrieved party."); *Standard Register Co. v. Bolton-Emerson, Inc.*, 38 Mass. App. Ct. 545, 551 (1995) ("Although acting within the scope of their authority as officers of Bolton, [the defendants] remain personally liable for their own

misrepresentations made to [the plaintiff] in violation of [Chapter] 93A, § 11, even though they did not sign the agreement.").

Werner, for his part, argues, *inter alia*, that "the only intentional misrepresentations [were] made by third parties in order to defraud [him] and BMI," and that Hoilman fails to support his contention that "BMI borrowed money from [him] for fraudulent reasons." Opp'n (Dkt # 115) at 6-7.[8] However, as a claim under Chapter 93A is equitable and a matter for the court and not the jury to decide, the force of the parties' arguments can better be assessed after the trial of Hoilman's remaining substantive claims and, if the court deems appropriate, with the (nonbinding) advice of the jury. *See Acushnet Fed. Credit Union v. Roderick*, 26 Mass. App. Ct. 604, 606 (1988). The court will therefore reserve ruling on the Chapter 93A claim (Count VIII) until after trial.

---

[8] Werner further argues that Hoilman's damages are capped at $20,000 under Mass. Gen. Laws ch. 231, § 85K, but even if BMI and Werner Management were charities, "[t]he $20,000 limitation on damages against charitable entities for tort liability, contained in [Chapter] 231, § 85K, does not apply to liability under [Chapter] 93A, which creates an independent statutory basis of liability." *Linkage Corp. v. Trs. of Bos. Univ.*, 425 Mass. 1, 27 (1997).

11

## ORDER

For the foregoing reasons, Hoilman's motion for partial summary judgment on Counts II, IV, VIII, and X is <u>DENIED</u>.  The Clerk will dismiss Counts II and IV, and set the remaining claims (with the exception of the Chapter 93A claim) for trial to a jury.

SO ORDERED.

<u>/s/ Richard G. Stearns        </u>
UNITED STATES DISTRICT JUDGE